**Ruth L. HILL, Appellant,**

v.

**The STATE of Oklahoma, Appellee.**

**No. A–17511.**

Court of Criminal Appeals of Oklahoma.

Oct. 25, 1972.

Ryan Kerr, Altus, for appellant.

Larry Derryberry, Atty. Gen., Mike Jackson, Asst. Atty. Gen., for appellee.

## OPINION

BUSSEY, Presiding Judge:

Appellant, Ruth L. Hill, hereinafter referred to as defendant, was charged and tried in the District Court of Jackson County, for the offense of Shooting With Intent to Kill. She was found guilty of Assault With a Dangerous Weapon With Intent to do Bodily Harm, sentenced to a term of five (5) years imprisonment, the first three (3) years to be served and the last two (2) years suspended, and from said judgment and sentence, a timely appeal has been perfected to this Court.

At the trial, Officer Becerra testified that on the evening of November 20, 1971 he proceeded to the emergency room of the Altus hospital in response to a radio call regarding a shooting. After interviewing several people at the hospital, he attempted to locate the defendant at several houses. He found the defendant at her mother's home drinking a beer. He placed her under arrest and transported her to the police station. He identified State's Exhibit 1, a .32-caliber revolver, as the gun given to him by the defendant's mother.

Dr. Betty Yeh testified that she examined Ramona Hill in the emergency room of Jackson Memorial Hospital on the evening in question. She observed two gunshot wounds in the anterior chest area. After asertaining that the bullets were still lodged in the body, Ramona Hill was given a blood transfusion and transported to Oklahoma City for chest surgery. She testified that the bullets were "pretty much horizontal."

At this point, the defendant stipulated that she had been advised of her constitutional rights; that she had informed the police as to the location of the gun; and that she had given them permission to enter the home and seize the weapon.

Ramona Hill testified that she was employed at the Blackout Bar on November 20, 1971 and arrived for work there at approximately 12:00 noon. At about 10:00 p.m., she and Patricia Lewis left the Blackout Bar and went to "Bubba Dee's" place. While there, she observed the defendant whom she had known almost all of her life. She had a conversation with Hattie Mae Herd. After staying approximately five or six minutes, she and Patricia Lewis returned to the Blackout Bar. She went straight to the kitchen and discussed with her boyfriend, Martin Fowler, what Hattie Mae Herd had told her. After completing the conversation, she returned to the bar of the tavern and stood at the end of the bar drinking. Fowler came out of the kitchen and told her "let's go". She took a few more drinks, turned around to get her purse and told Patricia Lewis to "come on, let's go". She started walking toward the door and when she got almost to the table where the defendant was sitting, she (the defendant) just started shooting. She testified that she did not have any weapon of any kind on her person when she was shot. Fowler picked her up, put her in the car and took her to the hospital.

On cross-examination, she admitted that she had been drinking pretty heavily on the evening in question. She denied telling Hattie Mae Herd that she was going to "whip" the defendant. She testified that she did not have a knife on the evening in question. She admitted that she had carried one up till almost two years ago when she quit because she cut somebody. She admitted that she was with a girl that cut the defendant approximately a year earlier. She denied having any part in the cutting fracas.

Patricia Lewis testified that she arrived at the Blackout Tavern on the day in question at approximately 9:00 p.m. and was again "drinking" with Ramona Hill. Later that evening, she and Ramona Hill went to Bubba Dee's. She observed Ramona Hill talking to Hattie Mae Herd while in Bubba Dee's. Shortly thereafter, she and Ramona left and returned to the Blackout and went straight to the kitchen. After spending several minutes in the kitchen, she came out and sat at the end of the bar.

About five minutes later, Ramona Hill came out of the kitchen and sat on the other end of the bar. They were both drinking. Approximately fifteen minutes later Ramona Hill asked her if she was ready to go. Ramona reached behind the bar, got her purse and started to leave. She heard a gunshot and upon turning around, saw the defendant with a gun in her hand. She heard two gunshots while she was inside and one after she got out the door.

Martin Fowler testified that he was in the Blackout Tavern on the evening in question. He went into the kitchen at approximately 9:45 and started preparing some food. While he was in the kitchen, Ramona Hill left the tavern and returned a short time later with Patricia Lewis. They talked in the kitchen for several minutes and both Ramona and Patricia returned to the bar area. He testified that he did not observe any type of weapon in the possession of Ramona when she left the kitchen. After he finished preparing the food, he walked out front, told Ramona to come on and proceeded on out the door. While he was standing outside, he heard the shots and someone came out screaming that the defendant had shot Ramona. He re-entered the tavern and observed Ramona coming toward the door. As she got to the door she began to collapse. He picked her up, put her in the car and took her to a hospital.

For the defense, Hattie Mae Herd testified that she had a conversation with Ramona Hill at Bubba Dee's on the evening in question. She observed a paring knife in Ramona Hill's hand. Ramona Hill advised her that she was going to whip the defendant, a "so-and-so." About that time, the defendant came into the bar and Hattie told her of Ramona's statement. Defendant replied, "Oh, I'm not going to pay her any attention."

On cross-examination, she admitted convictions for fighting and petit larceny.

The defendant testified that approximately one year earlier she was involved in a fight with some girls and in the process she was stabbed in the head. She testified that she did not know who had stabbed her but that Ramona Hill was present at the time and was the only one she (the defendant) saw with a knife. On the evening in question, she had a conversation with Hattie Mae Herd who informed her of the prior conversation with Ramona Hill. She left Bubba Dee's and as she was walking down the street, Ramona Hill was standing by a car talking to someone. She heard Ramona say "give me your gun" and "I'm going to whip Ruth L.'s, I don't want to use that word, but so-and-so." She (the defendant) kept walking along and took a gun from her purse and put it in her pocket. She stopped at the Purple Inn and stayed approximately five minutes. She next went to the Blackout and observed Ramona Hill standing in the kitchen. She sat down in a booth and heard Ramona Hill cursing her and stating what she was going to do to her. A short time later, Fowler came out of the kitchen and said, "Come on Mona, I'm going to take you home." Mona reached down, got something from behind the bar and "spied me." Ramona stated, "Yeah, some so-and-so's in here think they are smart." Ramona and Fowler walked past her booth and by the time they reached the second booth Ramona turned around and said, "Especially you, you so-and-so." She replied something back to her and "then here she come charging." Thinking that Ramona was going to shoot her, she raised the gun and fired. She testified that she was not in the habit of carrying a gun but that she had obtained the gun that evening from her mother for her own protection. Ramona Hill had made a threat toward her the previous night.

The first proposition asserts that the verdict is not sustained by sufficient evidence and is contrary to the evidence. Defendant first argues that the verdict is not sustained by the evidence due to the inconsistencies in the testimony of the State's witnesses at the preliminary hearing and at the trial. It has long been the rule in this jurisdiction that credibility

of a witness or witnesses is within the exclusive province of the jury. In Humphrey v. State, Okl.Cr., 452 P.2d 590, we stated in the second syllabi:

> "The credibility of the witnesses and the weight and value to be given their testimony is within the exclusive province of the jury to determine, and the jury may believe the evidence of a single witness upon a question of fact and disbelieve several others testifying to the contrary."

■ Defendant next argues under this proposition that the verdict is contrary to the evidence in that the defendant was acting in self-defense. We need only observe that the jury was properly instructed as to the question of self-defense. The evidence in behalf of the State adduced that the defendant was not acting in self-defense whereas the evidence on behalf of the defendant adduced that she was acting in self-defense. The jury, who was in the best position to judge the testimony of all the witnesses, apparently chose to believe the State's witnesses. We have consistently held that where there is competent evidence in the record from which the jury could reasonably conclude that the defendant is guilty as charged, this Court will not interfere with the verdict even though there is a sharp conflict in the evidence and different inferences may be drawn therefrom since it is the exclusive province of the jury to weigh the evidence and determine the facts. Jones v. State, Okl.Cr., 468 P.2d 805. We therefore find this proposition to be without merit.

■ The second proposition contends that the trial court erred in rulings of law occurring at the trial. Defendant argues that the trial court erred in overruling her objections to certain questions asked defense witness, Hattie Mae Herd, on cross-examination concerning her prior convictions. We have carefully examined the cross-examination of the witness, Hattie Mae Herd, and are of the opinion that the cross-examination as to her prior convictions was proper as tending to affect her credibility. The witness' response to the questions of the prosecuting attorney were evasive as shown by the following testimony:

> "Q. Have you ever been convicted of any crime?
>
> "A. For fighting I have.
>
> " * * *
>
> "Q. For fighting?
>
> "A. Yes.
>
> "Q. How many times?
>
> "A. About three, four or five.
>
> "Q. Could it have been more than that?
>
> "A. I don't know, you would have to check on that.
>
> "Q. I'm asking you.
>
> "A. I said I don't know.
>
> "Q. Could it have been more than five?
>
> "A. I don't know.
>
> " * * *
>
> "Q. Have you been convicted of anything besides fighting?
>
> "A. No.
>
> "Q. Never have?
>
> "A. No.
>
> " * * *
>
> "Q. Have you ever been convicted of petit larceny?
>
> "A. Do I have to answer that?
>
> " * * *
>
> "A. Well, I was charged with a crime but I didn't do it, but I was charged with it.
>
> "Q. Were you convicted of it?
>
> "A. I beg your pardon.
>
> "Q. Were you convicted of it?
>
> "A. Yeah, I guess so, I was charged with it." (Tr. 98–100)

We therefore find this proposition to be without merit.

■ The final proposition asserts that the sentence as assessed by the jury and subsequently modified by the trial court was excessive under the facts proved at

the trial. The record reflects that the jury assessed defendant's punishment at five years imprisonment. The trial court subsequently modified the sentence by suspending the last two years. We cannot conscientiously say that the sentence as modified shocks the conscience of this Court. The judgment and sentence is affirmed.

BRETT, J. concurs.